# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| OTIS POWELL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )    13 C 1859 |
| | ) |
| CITY OF BERWYN, CITY OF BERWYN | )    Judge John Z. Lee |
| POLICE OFFICERS STEVEN LOPEZ, | ) |
| STEVEN SICILIANI, EDWARD TOVAR, | ) |
| and SERGEANT RAMON ORTIZ, | ) |
| | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Plaintiff Otis Powell has sued the City of Berwyn and Berwyn Police Officers Lopez, Siciliani, and Tovar and Sergeant Ortiz pursuant to 42 U.S.C. § 1983 for violating his constitutional rights under the Fourth and Fourteenth Amendment to the U.S. Constitution, as well as malicious prosecution and conspiracy pursuant to state law.[1]  The City of Berwyn and Officers Lopez, Siciliani, Tovar, and Ortiz have moved for summary judgment.  For the reasons provided herein, the Court grants in part and denies in part Defendants' motion.[2]

## Factual Background

The following facts are undisputed unless otherwise noted.  On November 11, 2011, Plaintiff Otis Powell was employed by A&R Security as an armed security guard at an Aldi's grocery store.  Defs.' LR 56.1(a)(3) Stmt. ¶ 3.  Powell's shift started at 9:00 a.m. and ended at

---

[1] The City of Berwyn has been sued solely under the Illinois common law doctrine of *respondeat superior* and Illinois' statutory indemnification provision.

[2] In response to the instant motion for summary judgment, Plaintiff agrees to dismiss the following claims:  (1) the excessive force claim against Defendants Siciliani and Ortiz in Count I; (2) the equal protection claim against Defendants Siciliani, Lopez, and Ortiz in Count VI; (3) the intentional infliction of emotional distress claim against all Defendants in Count IX; and (4) the negligent training claim against the City of Berwyn in Count XI.  Pl.'s Resp. Br. 7.  These claims are therefore dismissed with prejudice.

approximately 8:00 p.m. *Id.* Powell left Aldi's and drove his car to his cousin's home for a family party. *Id.* ¶ 4. Powell was later joined by his fiancée, Ashley Crawford, who, that same day, was returning from an extended stay in Rockford, Illinois, and was going to begin living with Powell at an apartment located at 19th and Euclid, in Berwyn, Illinois. *Id.* Powell and Crawford left his cousin's home at approximately 2:00 a.m. *Id.* ¶ 5.

Crawford parked Powell's car on 19th Street, which required Powell and Crawford to cross the street in order to get to Powell's apartment building. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 2; Defs.' LR 56.1(a)(3) Stmt. ¶ 5. After parking, Powell removed a loaded gun in its holster from the trunk of his car. *Id.* ¶ 6. Powell walked with the holstered gun in his hand as he and Crawford walked down the street toward their building. *Id.* While driving near 19th and Euclid, Officers Lopez and Siciliani observed Powell walking with a holstered gun in his right hand, and Officer Siciliani reported what they had observed to the police dispatcher before confronting Powell. *Id.* Plaintiff and Defendants dispute the specifics of what happened next.

According to Plaintiff, he and Crawford were standing in front of his apartment building with his hand on the door, opening the door to the apartment building, when he first noticed Officers Siciliani and Lopez approaching in their police van, otherwise known as a squadrol. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 3. Plaintiff claims Officer Lopez yelled to him, "What the f*ck do you think you're doing?" *Id.* Plaintiff admits he was holding a holstered gun when he was approached by Officers Lopez and Siciliani and that he heard one of the officers order him to drop his weapon. *Id.* ¶¶ 4-5. Plaintiff claims he handed his gun over to Crawford who then placed the gun on the ground. *Id.* ¶ 5. Powell then handed his weapons credentials to the Officers, including his Firearm Owner Identification ("FOID"), Firearm Control card (referred to as a "tan" card), Permanent Employee Registration ("PERC"), and A&R employment cards. *Id.*

2

Officer Lopez had his gun pointed at Powell until Officer Tovar arrived on the scene about five to seven minutes later. *Id.* ¶ 7.

According to Powell, immediately upon his arrival, Officer Tovar rushed toward Powell, and Powell felt a shove and grab from the side with multiple hands attempting to take him down. *Id.*; Defs.' LR 56.1(a)(3) Stmt., Ex. K, Pl.'s Dep. at 167:17-168:19, 169:12-171:13. Powell heard one of the Officers say "back up," and then Officer Tovar began pepper-spraying Powell in the face and neck. *Id.* ¶ 8; Defs.' LR 56.1(a)(3) Stmt., Ex. K, Pl.'s Dep. at 179:18-20, 186:21-24, 194:12-20, 195:10-16. Defendant Officers then commanded Plaintiff to the ground; however, before Plaintiff was able to get himself to the ground, an officer kneed Plaintiff in the back, forcing him to the ground, flat on his stomach. *Id.* ¶ 9; Defs.' LR 56.1(a)(3) Stmt., Ex. K, Pl.'s Dep. at 212:11-213:12, 214:4-215:1. Defendant Officers then handcuffed Plaintiff. *Id.* at 215:15-22. During this entire incident, Plaintiff never pushed, swung at, or even attempted to move toward or run away from Defendant Officers. Defs.' LR 56.1(a)(3) Stmt., Ex. K, Pl.'s Dep. at 187:4-17, 406:9-14.

Defendants recount a different version of the facts. Defendants found Powell uncooperative from the beginning, yelling "I'm a f*cking security guard and I'm allowed to carry a weapon," after Officers Lopez and Siciliani commanded Powell to place his weapon on the ground. Defs.' LR 56.1(a)(3) Stmt. ¶ 8; *id.*, Ex. C, Lopez Decl. ¶¶ 6-7; Ex. E, Siciliani Decl. ¶¶ 6-7. When Officer Tovar arrived on the scene, he observed a visibly agitated and angry Powell. *Id.*, Ex. I, Tovar Decl. ¶ 3. Powell refused to produce identification and attempted to walk away from Tovar. *Id.* ¶¶ 4-5. Tovar informed Plaintiff that he was under arrest and instructed him to place his hands behind his back. *Id.* ¶ 5. In response, Powell pulled his arms away from Tovar and clenched his fist. *Id.* A short struggle ensued, and Tovar gave Powell a

verbal warning that he intended to deploy his pepper spray. *Id.* ¶ 6. Once Tovar deployed the spray, he moved Powell to the ground. *Id.* Powell continued to resist Tovar's attempts to handcuff him by pulling his arms away and kicking his legs. *Id.*

Defendant Tovar prepared a police report concerning the incident, and Defendants charged Powell with the misdemeanor offenses of unlawful use of a weapon ("UUW") and resisting arrest. *Id.* ¶ 9; Defs.' LR 56.1(a)(3) Stmt., Ex. B, Defs.' Answer, ¶¶ 34, 38. At Powell's bench trial, only Defendants Tovar and Siciliani testified as witnesses for the prosecution. Defs.' LR 56.1(a)(3)(C) Stmt. ¶ 19. On April 25, 2012, the judge acquitted Plaintiff of both charges. *Id.* ¶ 18.

Defendant Tovar issued thirty-three parking tickets to Powell's vehicle beginning just two days after Powell's arrest and ending approximately three months later when Powell's vehicle was repossessed. *Id.* ¶ 20; Pl.'s LR 56.1(b)(3)(C) Stmt. ¶ 20.

### Standard

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court gives "the non-moving party the benefit of conflicts in the evidence and reasonable inferences that could be drawn from it." *Grochocinski v. Mayer Brown Rowe & Maw, LLP,* 719 F.3d 785, 794 (7th Cir. 2013); *see Eastman Kodak Co. v. Image Technical Servs., Inc.,* 504 U.S. 451, 456 (1992). Plaintiff sues Defendants under section 1983, which permits an individual to sue for damages for the deprivation of rights "secured by the Constitution and laws of the United States." *Livadas v. Bradshaw,* 512 U.S. 107, 132 (1994).

### Analysis

Defendants argue that summary judgment should be granted because: (1) Defendant Officers had sufficient probable cause to arrest Plaintiff; (2) the force used was reasonable; and

(3) in the alternative, Defendant Officers are entitled to qualified immunity. The Court addresses each argument in turn.

## I. False Arrest (Count II)

Plaintiff alleges that Defendants lacked probable cause for his arrest, and therefore they violated his Fourth Amendment right to be free from unreasonable seizures. Pl.'s Resp. Br. 9. Defendants argue that summary judgment is warranted because they had probable cause to arrest Plaintiff. Defs.' Br. 7. Defendants also argue that they are entitled to qualified immunity. *Id.* at 17. As explained below, the Court finds that Defendants had a lawful basis to arrest Plaintiff for his undisputed possession of a gun while in a public street. Defendants also are independently entitled to summary judgment on this Count on grounds of qualified immunity.

"Probable cause to arrest is an absolute defense to any claim under Section 1983 against police officers for false arrest." *Mustafa v. City of Chi.,* 442 F.3d 544, 547 (7th Cir. 2006). Police officers have "probable cause to arrest when the facts and circumstances within their knowledge and of which they have reasonably trustworthy information are sufficient to warrant a prudent person in believing that the suspect had committed or was committing an offense." *Sheik–Abdi v. McClellan,* 37 F.3d 1240, 1246 (7th Cir. 1994). "Moreover, the court's inquiry is limited to what the officer knew at the time of the arrest and not what has been gained from hindsight." *Harney v. City of Chi.,* 702 F.3d 916, 922 (7th Cir. 2012) (citing *Mucha v. Vill. of Oak Brook,* 650 F.3d 1053, 1057 (7th Cir. 2011)).

"In deciding this question of law as part of a motion for summary judgment, however, we must give the non-moving party the benefit of conflicts in the evidence about what the officers actually knew at the time." *Williams v. City of Chi.,* 733 F.3d 749, 756 (7th Cir. 2013). With this in mind, the Court notes that:

[t]he law gives a police officer latitude to make reasonable judgments in light of the circumstances. While an officer may not close his or her eyes to clearly exculpatory facts, the Fourth Amendment does not require an officer with probable cause to arrest to wait while pursuing further investigation. In some situations, an officer may be required to conduct some investigation before making an arrest; in others, an officer may have probable cause for arrest without any need for investigation. Relevant factors include the information available to the officer, the gravity of the alleged crime, the danger of its imminent repetition, and the amount of time that has passed since the alleged crime.

*Stokes v. Bd. of Educ. of City of Chi.,* 599 F.3d 617, 624–25 (7th Cir. 2010); *see Guzell v. Hiller,* 223 F.3d 518, 519–20 (7th Cir. 2000).

On the date of Plaintiff's arrest, the law in Illinois provided that "[a] person commits the offense of unlawful use of weapons when he knowingly . . . [c]arries or possesses in any vehicle or concealed on or about his person except when on his land or in his own abode . . . any pistol, revolver . . . or other firearm." 720 Ill. Comp. Stat. 5/24-1(a)(4).[3] Plaintiff argues that he was "on his land" when the officers observed him carrying his gun and therefore they lacked probable cause to arrest him for the UUW offense. Pl.'s Resp. Br. 12. In support, Plaintiff places considerable reliance on the Illinois Supreme Court case of *People v. Laubscher.* 701 N.E.2d 489 (Ill. 1998). *Id.*

In *Laubscher*, the Illinois Supreme Court held:

Section 24-1(a)(4) broadly excepts from culpability any individual carrying a weapon while on "his land," meaning land over which he enjoys some ownership interest. There is nothing in the statute limiting the meaning of this phrase based upon the exclusivity of the individual's possession of the land, or the degree of public access he permits on the property. We believe that, had the legislature intended such a restriction, it would have explicitly provided for it.

---

[3] In 2013, after Plaintiff's arrest, the Illinois Supreme Court followed the Seventh Circuit's decision in *Moore v. Madigan*, 702 F.3d 933, 935–36 (7th Cir. 2012), and held that "on its face, the Class 4 form of section 24–1.6(a)(1), (a)(3)(A), (d) violates the right to keep and bear arms, as guaranteed by the Second Amendment to the United States Constitution." *People v. Aguilar*, 2 N.E.3d 321, 328 (Ill. 2013). Pursuant to the dictates of the Seventh Circuit in *Moore,* the Illinois legislature passed the Firearm Concealed Carry Act, which amended, *inter alia,* the aggravated UUW statute to allow for a limited right to carry an operable handgun in public. *See* Pub. Act 98–0063 (eff. July 9, 2013) (adding 430 Ill. Comp. Stat. 66/1 *et seq.*).

Further, to interpret this exception as the State suggests would be to expand the scope of the offense of unlawful use of weapons beyond the clear intent of the legislature.

701 N.E.2d at 492. "When determining whether a defendant was 'on his land' pursuant to section 24-1(a)(4), a jury may not consider the exclusivity of the defendant's possession or the degree of public access he permits." *People v. Hayes*, 719 N.E.2d 372, 375 (Ill. App. Ct. 1999).

Here, however, Plaintiff rented his apartment, and a renter does not necessarily have the same rights to the "on his land" exemption pursuant to section 24-1(a)(4). *See* Defs.' LR 56.1(a)(3) Stmt., Ex. K, Pl.'s Dep. at 13:16-14:4. In *People v. Pulley*, an Illinois Appellate Court addressed this specific issue, holding:

> In exempting property owners or persons in their fixed place of business, the legislature was mindful of the need of people to defend their homes and businesses from unlawful intruders and the fact that the police cannot protect every home and every business 24 hours a day. The renter also has this right insofar as his apartment is concerned. However, to allow all of the renters of one apartment complex to carry or possess a weapon in the common areas would be to invite the situation that the legislature sought to prevent, *i.e.,* the mass possession of weapons, which would pose a danger to the public and the police alike. In limiting the allowable possession of weapons to property in which one has ownership, the legislature has balanced a person's need to protect his home or business with the need of the general public and the police to be protected from potential use of weapons in situations unrelated to protecting one's property or business. We conclude, therefore, there is a rational basis for denying renters the right to possess weapons in the common areas of apartment buildings and find that the aggravated UUW statute does not violate equal protection.

803 N.E.2d 953, 961 (Ill. App. Ct. 2004).

Here, whether Plaintiff rented or owned his home is of no moment, because Defendant Officers had probable cause to arrest him for unlawful use of a weapon when they saw him carrying a gun on a public street. Plaintiff admits that he parked between a half block to two blocks away from his apartment building, and it was necessary for him to walk this half block to two blocks down and then across the street with the gun. *See* Defs.' LR 56.1(a)(3) Stmt., Ex. K, Pl.'s Dep., 65-67, 77-81. It also is undisputed that Defendant Officers Lopez and Siciliani

witnessed Plaintiff walking in the street with a holstered gun in his hand. *Id.*, Ex. C, Lopez Decl. ¶ 3; Ex. E, Siciliani Decl. ¶ 3. Plaintiff further acknowledges that Ms. Crawford made him aware of the Defendant Officers' presence prior to passing the sidewalk onto his apartment building's front yard and told him to put his gun away. *Id.*, Ex. K, Pl.'s Dep. at 80:1-14; 81:2-12. Even taken in the light most favorable to Plaintiff, the facts in the record show that the Defendant Officers had probable cause to arrest Plaintiff for a UUW offense.

Plaintiff's response briefly offers two additional arguments. First, Plaintiff argues that "even if this Court disregards [Plaintiff's] and Crawford's testimony as to where they were located at the time they were first stopped," the UUW false arrest claim still should survive because Plaintiff was dressed in his security guard uniform and showed Defendant Officers all the licenses and credentials required to be exempt from the UUW law. Pl.'s Resp. Br. 10 n.3; *id.* 14 (relying on 225 Ill. Comp. Stat. 447/35-35 (providing that possession of a valid firearm control card allows a licensee to carry a firearm while performing duties or commuting directly from place of employment)). Second, Plaintiff argues that the Defendant Officers lacked probable cause to arrest him because they did not know that it had been more than one hour since his Aldi shift ended, and thus they did not know whether the "one-hour exemption" applied to him. Pl.'s Br. 15 (relying on 720 Ill. Comp. Stat 5.24-2(a)(5) (providing that security guards are exempt from the UUW law "within one hour from departure from . . . place of employment.")). Unfortunately for Plaintiff, neither of these arguments saves this claim.

First, Plaintiff argues that the Defendant Officers lacked probable cause to arrest him for a UUW offense, because they saw that he was dressed in his security guard uniform and Plaintiff showed them his Firearm Owner Identification ("FOID") card, Firearm Control card ("tan

card"), Permanent Employee Registration ("PERC") card, and A&R employment card. This argument is unpersuasive.

*Rabin v. Flynn*, 725 F.3d 628 (7th Cir. 2013), is on point. There, the defendant officers arrested the plaintiff after witnessing him carrying a holstered gun on his hip in public. *Id.* at 630. None of the officers were familiar with the type of license Plaintiff had, which was a license carried primarily by private detectives and security officers. *Id.* When the officers finally confirmed that the plaintiff's license was legitimate, he was released. *Id.* The plaintiff then sued the officers for unlawful arrest, arguing that they should have been familiar with the license and should have released him as soon as he presented it. *Id.* The district court denied summary judgment on this basis, and the Seventh Circuit reversed, holding that "even if the officers had known what that type of license was, it still would have been reasonable under clearly established law for them to detain [the plaintiff] while they verified the legitimacy of a license to carry a deadly weapon." *Id.* The Seventh Circuit reasoned that at the time of the arrest "the officers still did not know (or have reason to know) all the relevant *facts* to determine whether [the plaintiff] could lawfully carry a gun in public—specifically, whether [the plaintiff's] tan card was legitimate" and that "[u]nder these circumstances, it would not be clearly unreasonable for an officer to believe that releasing an individual that may be unauthorized to carry a deadly weapon would present an unacceptable risk of danger to themselves or the public." *Id.* at 633–34 (emphasis in original); *see Milan v. City of Chi.*, No. 12 C 5621, 2013 WL 6255013, at *4 (N.D. Ill. Dec. 3, 2013) (stating that when determining probable cause to arrest a plaintiff, the "[d]efendants were not obligated to simply accept [the plaintiff's] explanations at face value, accept his 'status as a security guard,' and assume that his security guard credentials were legitimate"). Here, even accepting Plaintiff's argument that he

"stood before Defendants as a security guard in full uniform, saying he was a security guard, holding a holstered gun, showing the officers all the licenses and cards he was required to have," Defendants, like the officers in *Rabin*, were not required to accept Plaintiff's proffered credentials as legitimate. Pl.'s Resp. Br. 14; *see Rabin*, 725 F.3d at 633–34.

Plaintiff's second argument suffers from the same infirmity. At the time that Defendant Officers saw Plaintiff with the handgun walking on the street, they did not know (nor did they have reason to know) whether Plaintiff fell within the one-hour statutory exemption. Nor is there any evidence that, at the time of his arrest, Plaintiff ever told the officers that his shift had recently ended.[4] Thus, "[u]nder these circumstances, it would not be clearly unreasonable for [Defendants] to believe that releasing [Plaintiff who] may be unauthorized to carry a deadly weapon would present an unacceptable risk of danger to themselves or the public." *Id.* at 634.

Because the Court has found probable cause existed to arrest Plaintiff on the UUW offense, the Court need not address, at this juncture, whether probable cause existed as to Plaintiff's resisting arrest charge.[5] Unlike a malicious prosecution claim, "probable cause to believe that a person has committed *any* crime will preclude a false arrest claim, even if the person was arrested on additional or different charges for which there was no probable cause." *Holmes v. Vill. of Hoffman Estates,* 511 F.3d 673, 682 (7th Cir. 2007) (citing *Devenpeck v. Alford,* 543 U.S. 146, 153 (2004)). "Where an individual is arrested on multiple charges, a finding of probable cause for any one of the charges is sufficient to negate a § 1983 claim for

---

[4] In fact, a subsequent investigation revealed that Plaintiff had left his workplace approximately 6 hours before his encounter with the officers. *See* Pl.'s Resp. Defs.' LR 56.1(a)(3) Stmt. ¶ 3.

[5] The Court will address the existence of probable cause as to the resisting charge in the malicious prosecution section of this Order. *See Nolan v. Vill. of Dolton*, No. 10 C 7357, 2011 WL 1548343, at *4 (N.D. Ill. Apr. 21, 2011) ("[T]here are distinctions between false arrest and malicious prosecution claims, and a plaintiff can proceed on a malicious prosecution claim where she was charged with multiple offenses but there was not probable cause for all.").

false arrest." *McConnell v. McKillip,* 573 F. Supp. 2d 1090, 1102 (S.D. Ind. 2008) (citing *Ochana v. Flores,* 347 F.3d 266, 271 (7th Cir. 2003)).

Furthermore, because Defendants had probable cause to effectuate the Plaintiff's arrest, there is no need to address Defendants' argument that they are entitled to qualified immunity. *Tucker v. Williams,* 682 F.3d 654, 660 (7th Cir. 2012) ("Because we do not find a constitutional violation, we need not and do not address Williams' qualified immunity defense."). The Court thus grants Defendants' summary judgment motion as to Plaintiff's false arrest claim in its entirety and dismisses the claim with prejudice.

## II. Excessive Force and Failure to Intervene (Counts I and III)

### A. Excessive Force: Tovar and Lopez

Plaintiff alleges that Defendant Officers subjected him to excessive force when they arrested him. Compl. ¶¶ 59-65. Plaintiff's excessive force claim is based upon Defendant Officers Tovar's and Lopez's actions to physically restrain Plaintiff and Tovar's spraying of Plaintiff with pepper spray. Pl.'s Resp. Br. 4.

Notably, "summary judgment is often inappropriate in excessive force cases because the evidence surrounding the officer's use of force is often susceptible of different interpretations." *Cyrus v. Town of Mukwonago,* 624 F.3d 856, 862 (7th Cir. 2010) (citing *Catlin v. City of Wheaton,* 574 F.3d 361, 367 (7th Cir. 2009)). A police officer's ability to make an arrest "necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. O'Connor,* 490 U.S. 386, 396 (1989). Nonetheless, the Fourth Amendment prohibits the use of excessive force during the execution of a seizure, and a claim that law enforcement officers have used excessive force in the course of an arrest, investigatory

stop, or other seizure must be evaluated according to the Fourth Amendment's reasonableness standard. *Id.* at 395.

"Law enforcement is a difficult job, as 'police officers are often forced to make split-second judgments in circumstances that are tense, uncertain, and rapidly evolving.'" *Baird v. Renbarger*, 576 F.3d 340, 342 (7th Cir. 2009) (quoting *Graham*, 490 U.S. at 397). Therefore, the "reasonableness" of the use of force is judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight, and the officer's subjective good or bad intentions do not enter into the analysis. *Graham*, 490 U.S. at 396–97. Instead, the factors that a court must consider are: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. The Court also should consider whether the individual was under arrest or suspected of committing a crime, was armed, or was interfering or attempting to interfere with the officer's execution of his or her duties. *See McDonald v. Haskins*, 966 F.2d 292, 292–93 (7th Cir. 1992). In the end, the excessive force inquiry "looks to whether the force used to seize the suspect was excessive in relation to the danger he posed—to the community or to the arresting officers—if left unattended." *Id.* at 294.

Plaintiff argues that the evidence establishes genuine issues of material facts that the Defendant Officers used excessive force when they took him into custody. Pl.'s Resp. Br. 8. The Court agrees. Accepting the facts in the light most favorable to Plaintiff, there is evidence to show that Plaintiff did not resist arrest, did not flee, did not make physical contact with the officers, and presented no safety threat. *See* Defs.' LR 56.1(a)(3) Stmt., Ex. K, Pl.'s Dep. at 187:4-17, 406:9-14. Viewing Plaintiff's version of the facts as true, during this entire incident, Plaintiff never pushed, swung at, or even attempted to move toward or run away from Defendant

Officers. *See id.* Nevertheless, Plaintiff was pepper-sprayed in the face, kneed in the back, and wrestled to the ground *after* the Defendant Officers had already gained possession of Plaintiff's holstered gun. *See* Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 5, 8-11, 15-16. Defendants themselves admit to grabbing and tackling Plaintiff and administering pepper spray. *See* Defs.' LR 56.1(a)(3) Stmt., Ex. M, Apr. 25, 2012, Crim. Trial Tr. at 41:1-23.

The Seventh Circuit recently reaffirmed its prior holding that punitive actions taken once a suspect has been subdued constitutes excessive force. *See Green v. Chvala,* No. 13 C 3568, 2014 WL 2925182, at *3 (7th Cir. Jun. 30, 2014) ("once a suspect is subdued, violent force can be excessive . . . [and b]ecause Green has alleged that Chvala applied significant force after he was unable to resist, he states a claim for relief"); *Abbott v. Sangamon Cnty., Ill.,* 705 F.3d 706, 732 (7th Cir. 2013) ("[p]rior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects . . . [and] it was well-established in 2007 that police officers cannot continue to use force once a suspect is subdued"); *Gregory v. Oliver,* 226 F. Supp. 2d 943, 950 (N.D. Ill. 2002) (holding that it was clearly established that a leg sweep by an officer on a handcuffed suspect was excessive force); *Taylor v. Kveton,* 684 F. Supp. 179, 185 (N.D. Ill. 1988) (holding that defendant officers were not entitled to qualified immunity because "no reasonable officer would have believed that his actions in kicking an unresisting [plaintiff] . . . were lawful under the Fourth Amendment reasonableness standard.").

Accordingly, Plaintiff has presented disputed facts such that a reasonable jury could conclude that the Defendant Officers' actions constitute excessive force. Defendants argue that "even if [Plaintiff's] allegations are given any credence, his claims against all of the individual Defendants [as to excessive force] still fail because all of them are entitled to qualified

immunity." Defs.' Br. 17. As discussed in greater detail below, however, the same disputed facts also preclude the Court from affording the Defendant Officers qualified immunity with regard to the excessive force claim.

### B. Failure to Intervene: All Defendants

With respect to the Defendant Officers who were present during the disputed use of excessive force against Plaintiff, "[o]missions as well as actions may violate civil rights" and "under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983." *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). The Seventh Circuit has held:

> [I]in a section 1983 action alleging that police violated the plaintiff's Fourth Amendment rights by subjecting him to excessive force, a defendant police officer may be held to account both for his own use of excessive force on the plaintiff . . . as well as his failure to take reasonable steps to attempt to stop the use of excessive force used by his fellow officers.

*Sanchez v. City of Chi.*, 700 F.3d 919, 925–26 (7th Cir. 2012) (internal citations omitted). This affirmative duty to intervene attaches when the officer "observes or has reason to know that a constitutional violation is being committed and possesses a realistic opportunity to intervene to prevent the harm from occurring." *Yang*, 37 F.3d at 285. Therefore, in order to hold an officer liable under § 1983 for his alleged inaction, a plaintiff must show that the officer had reason to know "(1) that excessive force was being used, (2) that a citizen has been unjustifiably arrested, or (3) that any constitutional violation has been committed by a law enforcement official; *and* the officer had a realistic opportunity to intervene to prevent the harm from occurring." *Id.* The Seventh Circuit has explained that a "realistic opportunity" to intervene may exist when an officer could have called for help, or when an officer could have cautioned the officer using excessive force to stop. *Abdullahi v. City of Madison,* 423 F.3d 763, 774 (7th Cir. 2005) (quoting *Yang,* 37 F.3d at 285). *See also Sanchez v. City of Chi.*, 700 F.3d 919, 926 (7th Cir. 2012) (finding that even if officers did not personally use excessive force, they may still be held

liable for depriving Plaintiff of his rights if they failed "to take reasonable steps to attempt to stop the use of excessive force used by [their] fellow officers"). A claim of failure to intervene almost always implicates questions of fact for the jury. *Abdullahi*, 423 F.3d at 774.

Defendants admit that Officers Lopez, Siciliani, and Tovar were all present during the entire time of Plaintiff's arrest when the alleged excessive force occurred. *See* Defs.' LR 56.1(a)(3) Stmt., Ex. C, Lopez Decl. ¶¶ 2-10, Ex. E, Siciliani Decl. ¶¶ 2-9, Ex. I, Tovar Decl. ¶¶ 2-6. Consequently, viewing the facts in Plaintiff's favor, all three had a reasonable opportunity to intervene and thus the failure to intervene claims as to Officers Lopez, Siciliani, and Tovar survive summary judgment.

As for Sergeant Ortiz, however, he did not arrive at the scene until after the alleged constitutional injuries occurred, *id.*, Ex. G, Ortiz Decl. ¶ 2. Plaintiff himself admits he did not see Ortiz on the scene until after he was arrested, in handcuffs, and placed in the back of the police vehicle. *Id.*, Ex. K, Pl.'s Dep. at 222:19-24. Accordingly, the Court grants summary judgment as to Plaintiff's failure to intervene claim with regard to Defendant Ortiz, and that claim is dismissed with prejudice.

### C. Qualified Immunity

The remaining Defendant Officers—Lopez, Siciliani, and Tovar—next contend that they are entitled to qualified immunity with regard to the excessive force and failure to intervene claims.

> Qualified immunity shields government actors from liability for civil damages where their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have been aware. When making a qualified immunity determination, a court considers (1) whether the [evidence] show[s] that the defendant violated a constitutional right, and (2) whether that right was clearly established at the time of the defendant's conduct.

*Hernandez v. Foster,* 657 F.3d 463, 473 (7th Cir. 2011) (citations and internal quotations omitted). "A right is clearly established when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Id.* at 473–74 (brackets and internal quotations omitted). "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in the light of pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton,* 483 U.S. 635, 640 (1987) (citation omitted).

With the evidence viewed in the light most favorable to Plaintiff, the Defendant Officers are not entitled to qualified immunity on Plaintiff's excessive force and failure to intervene claims. According to Plaintiff, Defendant Officers Lopez and Tovar were the aggressors from the very beginning. Plaintiff's holstered gun had already been placed away from him on the ground and his credentials shown to Defendant Officers prior to any force by the Officers. Defs.' LR 56.1(a)(3) Stmt., Ex. K, Pl.'s Dep. at 154:4-155:13. Plaintiff claims nothing else was said or done before Defendant Tovar arrived and Defendants Lopez and Tovar spontaneously began grabbing and shoving him. *Id.* at 167:17-168:19, 169:12-171:13. Plaintiff felt multiple hands pushing him, attempting to take him to the ground. *Id.* at 178:21-179:14. Suddenly and without warning, Plaintiff heard Defendant Tovar tell the other Defendant Officers to back up before he began pepper-spraying Plaintiff in the face. *Id.* at 179:18-20, 186:21-24, 194:12-20. Defendant Officers then commanded Plaintiff to the ground; however, before Plaintiff was able to get himself to the ground, a Defendant Officer kneed Plaintiff in the back, forcing him to the ground, flat on his stomach. *Id.* at 212:11-213:12, 214:4-215:1. Defendant Officers then handcuffed Plaintiff. *Id.* at 215:15-22. During this entire incident, at least by Plaintiff's account,

he never pushed, swung at, or even attempted to move toward or run away from Defendant Officers. *Id.* at 187:4-17, 406:9-14. Therefore, Plaintiff's account does not portray him as a resister.

Viewing the facts in this light, reasonable officers should have known that they were not entitled to tackle, strike, and use pepper spray on a person who was not resisting or fighting back. *See Abbott,* 705 F.3d at 732 ("Prior to 2007, it was well-established in this circuit that police officers could not use significant force on nonresisting or passively resisting suspects." (citations omitted)); *Payne v. Pauley,* 337 F.3d 767, 779 (7th Cir. 2003) (use of force in arresting a subject who was not threatening to harm the police officer, not resisting or evading arrest, and was charged with minor offenses was not objectively reasonable); *Clash v. Beatty,* 77 F.3d 1045, 1048 (7th Cir. 1996) ("It is clear . . . that police officers do not have the right to shove, push, or otherwise assault innocent citizens without any provocation whatsoever."). Accordingly, Defendants' motion based on qualified immunity is denied.

Because the resolution of Plaintiff's excessive force and failure to intervene claims boils down to genuine issues of material fact, namely, whose account of the circumstances of the arrest ought to be believed, the Defendant Officers are not entitled to judgment as a matter of law. A jury, after assessing the parties' credibility, could reasonably find for either party. Accordingly, the Court denies Defendants' motion for summary judgment as to Plaintiff's excessive force and failure to intervene claims.

## III. Due Process (Count IV)

Plaintiff argues that his due process claim is properly premised on *Brady v. Maryland*, 373 U.S. 83 (1963). Pl.'s Resp. Br. 25;[6] *see Fields v. Wharrie,* 740 F.3d 1107, 1117 (7th Cir.

---

[6] In Plaintiff's response brief, he also appears to assert a new claim of substantive due process based on his receipt of thirty-three parking tickets. Pl.'s Resp. Br. 28. However, Plaintiff cannot amend his

2014) ("failing to disclose the false statement's corrupt origins at trial violates [plaintiff's] due-process right to a fair trial under the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)"). In response, Defendants argue that Plaintiff's due process claim is an improper "hybrid" false arrest/malicious prosecution claim. *Cf. Brooks v. City of Chi.,* 564 F.3d 830, 833 (7th Cir. 2009) ("A plaintiff cannot state a due process claim 'by combining what are essentially claims for false arrest under the Fourth Amendment and state law malicious prosecution into a sort of hybrid substantive due process claim under the Fourteenth Amendment.'") (quoting *McCann v. Mangialardi,* 337 F.3d 782, 786 (7th Cir. 2003)). It is unnecessary to reach this argument for the reasons discussed below.[7]

First, the Seventh Circuit has held that a plaintiff may not bring a section 1983 claim for malicious prosecution because Illinois tort law provides an adequate remedy. *See Newsome,* 256 F.3d at 750–51. However, the exact parameters of this rule are unsettled after *Whitlock v. Brueggemann,* 682 F.3d 567 (7th Cir. 2012), and *Fields,* 740 F.3d at 1117. In *Whitlock*, the Seventh Circuit held that "[t]he actions of an official who fabricates evidence that later is used to deprive someone of liberty can be both a but-for and proximate cause of the due process violation" and that "in a trial where the fabricated evidence is the crux of the case . . . a plaintiff could show that the fabrication was a but-for cause of his conviction." 682 F.3d at 583. Just two years later, the Seventh Circuit in *Fields* appeared to go further by stating in dicta that the

---

complaint by raising new claims in his brief in opposition to a motion for summary judgment. *Grayson v. O'Neill,* 308 F.3d 808, 817 (7th Cir. 2002).

[7] In Count IV of the Complaint, Plaintiff also purports to raise a claim for violation of "due process" under *Newsome v. McCabe,* 256 F.3d 747 (7th Cir. 2001). Compl. ¶¶ 77-84. Plaintiff alleges that Defendant Officers violated his Fourteenth Amendment procedural due process rights when they fabricated the story that he was in unlawful use of his weapon and thereafter resisted arrest. *Id.* Consequently, Plaintiff claims that the fabricated story led to his false arrest, the creation of false police reports, and the suppression of exculpatory evidence. *Id.* In response to Defendant's motion, however, Plaintiff appears to have abandoned any reliance on *Newsome*.

actionable injury may not be limited to the injury that resulted from the conviction and sentence but rather "the fabrication of evidence harmed the defendant before and not just during the trial, because it was used to help indict him." 740 F.3d at 1112. These cases appear to open the door for a due process claim based upon a defendant's use of fabricated evidence to secure the plaintiff's conviction and incarceration. *See Bianchi v. McQueen,* No. 12 C 364, 2014 WL 700628, at **10–12 (N.D. Ill. Feb. 24, 2014).

But, here, Plaintiff was acquitted of the charges, and the Seventh Circuit has expressed doubt whether "an acquitted defendant can ever establish the requisite prejudice for a *Brady* violation." *Carvajal v. Dominguez*, 542 F.3d 561, 570 (7th Cir. 2008). This is because the Seventh Circuit found the passage from the Supreme Court to be instructive:

> [T]he term "*Brady* violation" is sometimes used to refer to any breach of the broad obligation to disclose exculpatory evidence—that is, to any suppression of so-called "*Brady* material"—although strictly speaking, there is never a real "*Brady* violation" unless the nondisclosure was so serious that there is a reasonable probability that the suppressed evidence would have produced a different verdict.

*Id.* (citing *Strickler v. Greene,* 527 U.S. 263, 290 (1999)).

Later that year, in *Bielanski v. County of Kane,* 550 F.3d 632 (7th Cir. 2008), the Seventh Circuit reiterated the doubt expressed in *Carvajal*, noting that "[t]he Supreme Court has yet to address the situation . . . where evidence was withheld by the prosecution and yet the defendant was still acquitted" and that the Sixth, Tenth, and Eleventh Circuits have definitively concluded that a *Brady* claim is extinguished when a defendant is acquitted. *Id.* at 644 (citing *Morgan v. Gertz,* 166 F.3d 1307, 1310 (10th Cir. 1999); *Flores v. Satz,* 137 F.3d 1275, 1278 (11th Cir. 1998); *McCune v. City of Grand Rapids,* 842 F.2d 903, 907 (6th Cir. 1988)).

Finally, in 2012, the Seventh Circuit had another occasion to address this issue in *Alexander v. McKinney*, 692 F.3d 553 (7th Cir. 2012). In that case, the Seventh Circuit affirmed

the district court's dismissal of the plaintiff's due process claim where the plaintiff was released on bond the same day he was arrested and eventually acquitted. *Id.* In so doing, the Seventh Circuit distinguished two prior cases, *Zahrey v. Coffey*, 221 F.3d 342 (2d Cir. 2000) and *Whitlock*, 682 F.3d 567, on the grounds that "[i]n both *Zahrey* and *Whitlock*, the alleged liberty deprivation came not from the initial arrest, but from the time spent in confinement *after* arrest," whereas the only deprivation the plaintiff in *Alexander* alleged stemmed from his initial arrest. *Id.* (emphasis in original).[8] The court reasoned that "[i]t would be anomalous to hold that attending a trial deprives a criminal defendant of liberty without due process of law, when the purpose of the trial is to *effectuate* due process." *Id.* at 557 n.2 (emphasis in original).

Following the Seventh Circuit's reasoning in *Alexander*, a court within this district recently addressed this very issue. *Bianchi*, 2014 WL 700628, at *12 (Dow, J.). In *Bianchi*, the plaintiffs were acquitted after a two-day bench trial. *Id.* at *4. Subsequently, the plaintiffs brought a due process claim based on alleged "evidence fabrication and another based on the withholding of material exculpatory evidence in contravention of *Brady v. Maryland,* 373 U.S. 83 (1963)." *Id.* at *9. The complaint alleged that the defendants "attempted to secure [a] wrongful conviction . . . by fabricating witness statements, manufacturing evidence, suppressing exculpatory evidence and continuing to conceal their wrongdoing . . . during the criminal proceedings." *Id.* The district court disagreed, holding:

---

[8] In *Zahrey*, the plaintiff had been arrested and held without bail for eight months before ultimately being acquitted of the charges. 221 F.3d at 348. The plaintiff brought a due process claim, alleging that the police officers and prosecutors conspired to manufacture false evidence to bring criminal charges against him. *Id.* at 345–46. The Second Circuit agreed, finding that the plaintiff had a "right not to be deprived of liberty as a result of the fabrication of evidence by a government officer acting in an investigating capacity." *Id.* at 349. Similarly, in *Whitlock*, the plaintiffs spent seventeen and twenty-one years in prison before having their high-profile double homicide convictions overturned on the basis of numerous *Brady* violations. 682 F.3d at 570. The Seventh Circuit found that "a prosecutor acting in an investigatory capacity who fabricates evidence that is used to obtain a wrongful criminal conviction violates a convicted defendant's clearly established due process rights." *Alexander*, 692 F.3d at 557 (citing *Whitlock*, 682 F.3d at 585–86).

As *Alexander* demonstrates, fabricating evidence only violates a clearly established constitutional due process right if it results in a wrongful conviction or incarceration. Short of that, an evidence fabrication claim is, in essence, a claim of malicious prosecution (i.e., a claim that the plaintiff was arrested and prosecuted without probable cause), which, in Illinois, must be brought pursuant to state law.

*Id.* at *11. Pursuant to *Alexander*, Judge Dow reasoned that because the "[p]laintiffs contend that the evidence caused them to be indicted, arrested, and prosecuted in the absence of probable cause" but were nonetheless acquitted, the "[p]laintiffs have not stated a violation of a clearly established constitutional right, and any evidence fabrication claim that they may have must be brought under state law." *Id.* at *12.

The Court finds Judge Dow's reasoning in *Bianchi* persuasive. Accordingly, Plaintiff fails to state a claim as a matter of law. The Court grants Defendants' motion as to Plaintiff's due process claim, and it is dismissed with prejudice.

## IV. Section 1983 Conspiracy: Count V

In Count V, Plaintiff alleges that the Defendant Officers "expressly or impliedly formed an agreement to falsely arrest . . . Plaintiff in violation of his constitutional rights and deprive Plaintiff of his right to a fair trial." Compl. ¶ 86. Plaintiff argues that as evidence of this conspiracy "all of the Defendant are necessarily telling lies about the night of the arrest, in their police reports and in their sworn testimony" and that "[n]ot only are the Defendants lying, they are telling the exact same lies about Powell's actions and the circumstances surrounding itself." Pl.'s Resp. Br. 21.

To establish a *prima facie* case of civil conspiracy, a plaintiff must show (1) an express or implied agreement among defendants to deprive the plaintiff of his constitutional rights, and (2) actual deprivations of those rights in the form of overt acts in furtherance of the agreement." *Thurman v. Vill. of Hazel Crest,* 570 F. Supp. 2d 1019, 1029 (N.D. Ill. 2008) (citing *Scherer v.*

*Balkema,* 840 F.2d 437, 441 (7th Cir. 1988)).  To sustain a civil conspiracy claim, the plaintiff must allege that defendants "directed themselves toward an unconstitutional action by virtue of a mutual understanding[,]" and support such allegations with facts suggesting a "'meeting of the minds.'"  *Id.* (quoting *Amundsen v. Chi. Park Dist.,* 218 F.3d 712, 718 (7th Cir. 2000)).  As the Seventh Circuit has stated, however, "'[a] party may not cry 'conspiracy' and throw himself on the jury's mercy.'"  *Kelley v. Myler,* 149 F.3d 641, 649 (7th Cir. 1998) (quoting *Gramenos v. Jewel Cos., Inc.,* 797 F.2d 432, 436 (7th Cir. 1986)); *see McAfee v. 5th Circuit Judges,* 884 F.2d 221, 222 (5th Cir. 1989) ("mere conclusory allegations of conspiracy cannot, absent reference to material facts, state a substantial claim of federal conspiracy" (citation and quotation omitted)).

As an initial matter, it is worth noting that a finding of probable cause as to Plaintiff's false arrest negates a conspiracy claim as to the false arrest, and we are left only with the proffered facts relating to Plaintiff's alleged conspiracy to deprive him of a fair trial.  *See Southern v. City of Harvey, Ill.*, No. 2008 WL 4866337, at *3 (N.D. Ill. Jun. 4, 2008) ("Defendants had probable cause to arrest plaintiff on November 20, 2004, which negated plaintiff's false arrest claims and, therefore, precludes plaintiff from succeeding on his claim of conspiracy.").  That being said, the summary judgment record is devoid of any facts from which a reasonable jury could infer the existence of an express or implied agreement among the Defendant Officers to deprive Plaintiff of his right to a fair trial.  Tellingly, in his response to the summary judgment motion, Plaintiff offers no facts to support this claim, arguing only that "[t]hat Defendants have the same exact false story is itself evidence that they have conspired against Plaintiff."  Pl.'s Resp. Br. 21.

Furthermore, even if Plaintiff had put forth evidence of a cover-up, conspiracy is not an independent basis for liability under section 1983 under these circumstances.  "Although the

Seventh Circuit has recognized a section 1983 claim where police officers attempt to conceal unlawful conduct, the basis for the claim lies in the denial of a plaintiff's right of access to the courts." *Moore v. City of Chi.*, No. 13 C 483, 2014 WL 2457630, at *9 (N.D. Ill. May 30, 2014) (Holderman, J.) (citing *Vasquez v. Hernandez,* 60 F.3d 325, 328–29 (7th Cir. 1995)); *see Kies v. City of Aurora,* 149 F. Supp. 2d 421, 424 (N.D. Ill. 2001) (Alesia, J.) ("[C]oncealment of constitutional violations, such as false arrest, excessive force, and malicious prosecution, are insufficient to raise a separate constitutional violation unless the victim is deprived of his or her right to access to the courts.") (internal citations and quotations omitted).  What is more, in order to deny a plaintiff access to the courts, the cover-up must be to some extent successful.  *See Cefalu v. Vill. of Elk Grove,* 211 F.3d 416, 423 (7th Cir. 2000) ("[A]n attempt to cover up police wrongdoing which succeeded only briefly in hiding the facts from the plaintiffs, and which ultimately neither prevented the plaintiffs from pursuing relief nor reduced the value of their claim, was not actionable under section 1983.").

Plaintiff has not provided facts from which a reasonable jury could infer that the alleged conspiracy (to the extent one existed) deprived him of access to the courts.  *See* Pl.'s Resp. Br. 20-22.  A claim for denial of access to the courts requires (1) a deprivation of the information necessary to bring a meritorious suit and obtain an adequate remedy and (2) a concrete injury resulting from the cover-up.  *Gibson v. City of Chi.,* 910 F.2d 1510, 1523–24 (7th Cir. 1990). Plaintiff does not lack the information necessary to bring a meritorious suit; he had access to the evidence—in the form of his own and Crawford's testimony—that would refute the Defendant Officers' testimony that he resisted arrest.  *See Cefalu,* 211 F.3d at 424 (holding "a jury could not find for the plaintiffs on the cover-up claim because the facts that they needed to recover for their asserted injuries have always been known to them").  Furthermore, Plaintiff has not suffered a

concrete injury from the alleged cover-up because he was acquitted. Defs.' LR 56.1(a)(3) Stmt. ¶ 18.

Because Plaintiff has failed to provide more than bald conclusory statements regarding a conspiracy and has not presented any facts showing that he has been deprived of access to the courts, the Court grants Defendants' motion for summary judgment as to the section 1983 conspiracy claim.

## V. Equal Protection Claim Against Tovar (Count VI)

Plaintiff also alleges that Defendant Tovar violated his rights under the Equal Protection Clause based upon Tovar's issuing thirty-three parking tickets to Plaintiff's vehicle in a three-month period beginning just two days after his arrest. Compl. ¶¶ 92-96; Pl.'s Resp. Br. 22-23. Defendants argue that summary judgment is warranted here because Plaintiff has failed to establish a triable issue of fact regarding Tovar's illegitimate animus or the arbitrary and irrational nature of Tovar's conduct. Defs.' Br. 14. For the reasons discussed below, the Court holds that Plaintiff has made a sufficient showing of animus to survive summary judgment.

Generally, equal protection claims involve charges of singling out members of a vulnerable group for unequal treatment attributable to the state. *See LaBella Winnetka, Inc. v. Vill. of Winnetka,* 628 F.3d 937, 941 (7th Cir. 2010); *Bell v. Duperrault,* 367 F.3d 703, 707 (7th Cir. 2004). But it also bars state action that "irrationally singles out and targets an individual for discriminatory treatment" as a so-called "class of one," although such claims are difficult to prove. *LaBella,* 628 F.3d at 941 (citing *Reget v. City of La Crosse,* 595 F.3d 691, 695 (7th Cir. 2010)); *see McDonald v. Winnetka,* 371 F.3d 992, 1001 (7th Cir. 2004).

To state a class-of-one equal protection claim, Plaintiff must allege that (1) Defendant Tovar intentionally treated him differently than others who were similarly situated and (2) there

was no rational basis for the difference in treatment or the cause of the differential treatment was an illegitimate animus towards him. *Woodruff v. Mason,* 542 F.3d 545, 554 (7th Cir. 2008).[9]  A class-of-one claim can be based on the irrational or malicious application of law enforcement powers. *Geinosky v. City of Chi.,* 675 F.3d 743, 747 (7th Cir. 2012).   In order to prevail on a class-of-one equal protection claim, a plaintiff must present evidence of at least one similarly situated individual who is "prima facie identical in all relevant respects or directly comparable [to the plaintiff] . . . in all material respects." *United States v. Moore,* 543 F.3d 891, 896 (7th Cir. 2008) (citing *Racine Charter One, Inc. v. Racine Unified Sch. Dist.,* 424 F.3d 677, 680 (7th Cir. 2005)); *Sellars v. Gary,* 453 F.3d 848, 850 (7th Cir. 2006) (same).

*Swanson v. City of Chetek*, 719 F.3d 780 (7th Cir. 2013), is illustrative.   There, the plaintiff wanted to build a three-foot fence between his property and the property of his neighbor in the process of remodeling his home.  *Id.* at 781.  Unfortunately for him, his neighbor was the mayor of the city.  *Id.*  On summary judgment, Swanson presented evidence that the mayor had engaged in harassing conduct that had no legitimate basis.  *Id.* at 782.  The mayor's harassment included entering the plaintiff's home without permission, using his mayoral influence to block the plaintiff's request for a fence permit, telling the fence contractor that the plaintiff and his girlfriend were drug dealers and unlikely to pay the contractor, and causing the City to prosecute the plaintiff for violating the fence ordinance without any legal basis.  *Id.*  The district court granted summary judgment because the plaintiff had failed to present evidence of a similarly situated comparator.  *Id.*  The Seventh Circuit reversed, holding that, at the summary judgment stage, "a clear showing of animus, absent a robust comparison to a similarly situated individual,

---

[9] The Seventh Circuit is divided as to whether a plaintiff must demonstrate that he or she was treated differently because of an improper motive. *See Del Marcelle v. Brown Cnty. Corp.,* 680 F.3d 887, 889, 900, 913–14 (7th Cir. 2012).

may sustain a class-of-one equal protection claim." *Id.* The *Swanson* court concluded that "where the direct showing of animus was very strong" based on a series of actions "that appear illegitimate on their face," it "would be oddly formalistic to then demand a near identical, one-to-one comparison to prove the readily-apparent hostility." *Id.* at 785; *see Fenje v. Feld,* 398 F.3d 620, 628 (7th Cir. 2005) ("[A]n 'orchestrated campaign of official harassment directed against [the plaintiff] out of sheer malice,' 'vindictiveness,' or 'malignant animosity' would state a claim for relief under the Equal Protection Clause.") (quoting *Esmail v. Macrane,* 53 F.3d 176, 178–79 (7th Cir. 1995)); *see also Nevel v. Vill. of Schaumburg,* 297 F.3d 673, 681 (7th Cir. 2002); *Hilton v. City of Wheeling,* 209 F.3d 1005, 1008 (7th Cir. 2000) (so-called "vindictive action" equal protection cases require proof of "a totally illegitimate animus toward the plaintiff by the defendant").

Geinosky v. City of Chicago, 675 F.3d 743 (7th Cir. 2012), also is helpful. In that case, the plaintiff received twenty-four bogus parking tickets within a year, all written by officers of Unit 253 of the Chicago Police Department. *Id.* at 745. Because the plaintiff had failed to allege a similarly situated individual, however, the district court granted the City's motion to dismiss. *Id.* at 749. The Seventh Circuit reversed, explaining:

> [R]equiring Geinosky to name a similarly situated person who did not receive twenty-four bogus parking tickets in 2007 and 2008 would not help distinguish between ordinary wrongful acts and deliberately discriminatory denials of equal protection . . . . On these unusual facts—many baseless tickets that were highly unlikely to have been a product of random mistakes—Geinosky's general assertion that other persons were not similarly abused does not require names or descriptions in support.

*Id.* at 748–49.

Here, as in *Geinosky* and *Swanson*, the pattern and nature of Defendant Tovar's conduct is sufficient evidence of illegitimate animus and improper discriminatory purpose to save Plaintiff's claim from summary judgment. Tovar issued thirty-three parking tickets to Plaintiff's

vehicle beginning just two days after the November 12, 2011, incident and ending in February 2012 when Plaintiff's car was repossessed. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 19-21. Although Tovar denies that he knew the identity of the vehicle's owner, Defendants do not appear to dispute the number of tickets given to Plaintiff within the short and highly relevant timeframe. *See* Defs.' Resp. Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 19-21. Additionally, the validity of the tickets themselves is disputed. *See* Pl.'s Resp. Defs.' LR 56.1(a)(3) Stmt. ¶ 21. As the Seventh Circuit held in *Geinosky*, where the "facts so clearly suggest harassment by public officials that has no conceivable legitimate purpose," Plaintiff need not identify a similarly situated person in order to create issues of material fact sufficient to survive summary judgment. *See* 675 F.3d at 748. The Court denies Defendants' summary judgment motion as to Plaintiff's class-of-one claim against Defendant Tovar.

## VI.     Malicious Prosecution: Count VIII

Next, Plaintiff has sued Defendants for malicious prosecution under Illinois law. "In order to prevail on a malicious prosecution claim, a plaintiff must establish '(1) the commencement or continuance of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause for such proceeding; (4) the presence of malice; and (5) damages resulting to the plaintiff.'" *Holland v. City of Chi.,* 643 F.3d 248, 254 (7th Cir. 2011) (quoting *Swick v. Liautaud,* 662 N.E.2d 1238, 1242 (Ill. 1996)). If any of the elements are not satisfied, the plaintiff cannot recover. *Swick*, 662 N.E.2d 1238 at 1242. The existence of probable cause to arrest, for instance, is a complete defense. *Kies v. Aurora,* 156 F. Supp. 2d 970, 981 (N.D. Ill. 2001).

Turning to the merits, Defendants argue that they are entitled to summary judgment because the charges against Plaintiff were supported by probable cause. As discussed above, the Court has found that there was probable cause to arrest Plaintiff for the UUW offense and has dismissed Plaintiff's section 1983 claim of false arrest. The Court likewise grants Defendants' summary judgment motion with regard to Plaintiff's malicious prosecution claim based on the UUW offense.

This does not conclude the Court's discussion, however, because the Seventh Circuit has held that "probable cause to believe an individual committed one crime . . . does not foreclose a malicious prosecution claim for additionally prosecuting the individual on a separate charge." *Holmes*, 511 F.3d at 682. The Court must therefore address whether there was probable cause to charge Plaintiff for resisting arrest.

Based upon the record, the Court finds that there are material facts in dispute as to this issue. As discussed above, the parties dispute: (1) the statements and actions of Defendants and Plaintiff leading up to and during the arrest; (2) Plaintiff's physical responses to Defendants' questions or commands; and (3) Plaintiff's conduct and demeanor leading up to the handcuffing and pepper-spraying of Plaintiff, all of which are relevant to the determination of whether a reasonable officer would have believed he had probable cause to arrest and charge Plaintiff for resisting arrest.

Pursuant to Illinois law, a person commits the misdemeanor of resisting arrest when he or she "knowingly resists or obstructs the performance by one known to the person to be a peace officer." 720 Ill. Comp. Stat. 5/31-1(a). Additionally, "[i]t is well settled under Illinois law . . . that the resistance must be physical; mere argument will not suffice." *Payne,* 337 F.3d at 776. According to Plaintiff, he did not disobey any of the Defendants' orders; he turned over his

relevant papers and obeyed their commands every step of the way.  In support, Plaintiff states he did not disobey any order to "stand back" made by any Defendant Officer; he made no movement whatsoever towards the Officers during the incident; and he in no way resisted, struggled, or pulled away from any of the Officers, including when he was shoved, pepper-sprayed, taken-down forcefully, and put into handcuffs.  Pl.'s LR 56.1(b)(3)(C) Stmt. ¶¶ 5-11; Defs.' LR 56.1(a)(3) Stmt., Ex. K, Pl.'s Dep. at 406:2-14.

Viewing the facts in the light most favorable to Plaintiff, as the Court must do, there exist genuine issues of fact as to whether a reasonably prudent person would have believed that Plaintiff was resisting the arrest.[10]  Accordingly, the Court denies Defendants' summary judgment motion as to Plaintiff's malicious prosecution claim based on the resisting arrest offense.[11]

## VII.    Civil Conspiracy (Count VII)

Plaintiff also asserts a civil conspiracy claim.  Under Illinois law, a conspiracy consists of "a combination of two or more persons for the purpose of accomplishing by some concerted action either an unlawful purpose or a lawful purpose by unlawful means."  *Karas v. Strevell*, 884 N.E.2d 122, 138 (Ill. 2008) (citation omitted).  "There is no such thing as accidental, inadvertent or negligent participation in a conspiracy."  *Adcock v. Brakegate, Ltd.,* 645 N.E.2d 888, 894 (Ill. 1994)).  "A defendant who innocently performs an act which happens to

---

[10] Defendants do not contest the other elements of malicious prosecution in this respect.  Therefore, for summary judgment purposes, they have waived any argument regarding these elements. *See Baker v. Ghidotti*, No. 11 C 4197, 2014 WL 1289566, at *7 (N.D. Ill. Mar. 28, 2014) (holding that because the defendants provided no argument or evidence to support granting summary judgment as to the third and fifth elements of the malicious prosecution claim, any argument was deemed waived).

[11] As stated above, the malicious prosecution claim proceeds only as to the resisting arrest offense and not the UUW offense.  The Court thus grants Defendants' motion for summary judgment as to Plaintiff's malicious prosecution claim against Defendant Ortiz, because Plaintiff does not assert that Defendant Ortiz was involved in charging him with resisting arrest. *See* Pl.'s Resp. Br. 19.

fortuitously further the tortious purpose of another is not liable under the theory of civil conspiracy." *Id.*

"As the third element of this test indicates, however, civil conspiracy is not an independent tort:  if a 'plaintiff fails to state an independent cause of action underlying his conspiracy allegations, the claim for conspiracy also fails.'" *Jones v. City of Chi.*, No. 2011 WL 1898243, at *6 (N.D. Ill. May 18, 2011) (quoting *Thomas v. Fuerst,* No. 08 C 3501, 803 N.E.2d 619, 626 (Ill. App. Ct. 2004)); *see Thermodyne Food Serv. Prods., Inc. v. McDonald's Corp.,* 940 F. Supp. 1300, 1310 (N.D. Ill. 1996) ("[A] conspiracy claim alleging a tort as the underlying wrongful act is duplicative where the underlying tort has been pled."); *LoggerHead Tools, LLC v. Sears Holding Corp.*, No. 12 C 9033, 2013 WL 5951832, at *5 (N.D. Ill. Nov. 6, 2013) ("Additionally, to the extent the underlying tort of the alleged civil conspiracy, fraud, is already alleged by [the plaintiff], the civil conspiracy claim is rendered duplicative."); *Real Colors, Inc. v. Patel,* 974 F. Supp. 645, 651 (N.D. Ill. 1997) ("Conspiracy alleging a tort as the underlying wrongful act is actionable, as long as it includes additional defendants or new facts not already pled in the underlying tort.").  In the instant action, the same underlying state law tort—that of malicious prosecution—is the basis for the state law civil conspiracy claim.  In addition, Plaintiff does not allege any additional defendants or facts in the conspiracy claim as compared to the malicious prosecution claim. Thus, the state law civil conspiracy claim is duplicative.

Even if there were an alternative underlying state law tort, Plaintiff's state law conspiracy claim still fails.  While Plaintiff may rely on circumstantial evidence, he is still required to prove an agreement and "merely failing to prevent the unlawful conduct of one party or assisting an unlawful actor does not necessarily constitute a conspiracy."  *Webb v. Local 73, Serv. Emps.*

*Int'l, AFL-CIO,* No. 02 C 3279, 2002 WL 31049841, at *2 (N.D. Ill. Nov. 7, 2002).[12]  Here, Plaintiff has offered no evidence of a conspiracy beyond conclusory assertions.  For these reasons, summary judgment is granted as to Plaintiff's civil conspiracy claim.

## Conclusion

For the reasons provided in this Memorandum Opinion and Order, the Court grants in part and denies in part Defendants' motion for summary judgment [doc. no. 47].  The Court grants the motion as to Counts II, IV, V, VIII, and IX in their entirety and grants the motion in favor of Defendant Ortiz only as to Count III.  In addition, Plaintiff has agreed to dismiss:  (1) the excessive force claim against Defendants Siciliani and Ortiz in Count I; (2) the equal protection claim against Defendants Siciliani, Lopez, and Ortiz in Count VI; (3) the intentional infliction of emotional distress claim against all Defendants in Count IX; and (4) the negligent training claim against the City of Berwyn in Count XI, and these claims are dismissed with prejudice. Because there are no remaining claims against Defendant Ortiz, he is dismissed as a defendant in this case.  The Court denies the motion as to Counts I, III, and VI with regard to Defendants Lopez, Siciliani, and Tovar and Count X and XI with regard to the City of Berwyn.

**SO ORDERED**                    **ENTER:  9/19/14**

**JOHN Z. LEE**
**United States District Judge**

---

[12] In *Webb*, the court held that "[e]ven if the County did use the 'temporary employee' designation to cheat employees of their rights it does not necessarily follow that the Union's refusal to protect Plaintiffs' rights under the CBA was part of an agreement with the County" or that "the County and Union were acting in concert under an agreement." *Webb v. Local 73, Serv. Emps. Int'l, AFL-CIO*, No. 02 C 3279, 2002 WL 31497352, at *4 (N.D. Ill. Sept. 13, 2002); *see Beal v. City of Chi.*, No. 04 C 2039, 2007 WL 1029364, at *12 (N.D. Ill. Mar. 30, 2007) ("The Command Personnel may have failed in their duty to prevent unlawful conduct among their subordinates and the Officers may have assisted in carrying out unlawful arrests, but such conduct does not demonstrate their complicity in a single plan with a common and understood goal.").